## ALBERT C. OLSON v. GRIFFIN WHEEL COMPANY.[1]

No. 33,745.

June 30, 1944.

*Charles H. Weyl* and *George W. Mantor,* for relator.

*Doherty, Rumble, Butler, Sullivan & Mitchell* and *Edgar G. Vaughan,* for respondent.

STREISSGUTH, JUSTICE.

On February 7, 1929, Albert C. Olson (referred to as relator, though now deceased), then 55 years of age, while employed as an iron molder by respondent, was injured when a freight elevator dropped and caught his left foot and heel, tearing off the heel cord and the os calcis and fracturing the posterior portion of the latter.

An operation was performed, the tendon Achilles being repaired and the wound sewed up; but after several days the wound sloughed and gangrenous infection set in. Relator was hospitalized until April 20, 1929, and then taken to his home, where he remained under medical care until the spring of 1930. By that time the infection had cleared up sufficiently to permit his being fitted with

[1]Reported in 15 N. W. (2d) 511.

a special shoe. On March 14, 1930, he returned to work at respondent's plant, where he continued until August 21, 1931. He was first assigned to a facing machine, where he shoveled sand. Later, however, he was given a job pushing cores in a truck, which caused a recurrence of the infection, requiring treatment several times a week. In September 1931, a second operation disclosed serum and pus in the heel area and considerable granulation tissue about the sinuses. The infectious condition failed to clear up, and on December 26, 1931, an amputation of the left leg, about eight inches below the knee, was resorted to. In March 1932, relator was fitted with an artificial limb. On April 1933, he began training as a shoe repairer under the direction of the State Division of Re-Education. He continued this training for 25 weeks and, subsequently for three months, worked intermittently as an apprentice at a shoe repair shop.

In April 1934, the State Division of Re-Education assigned relator to work at the Goodwill Industries in St. Paul. There he did such shoe repairing as he could while sitting down, but he was troubled continuously with his leg. He worked at this "job" off and on until September 1935, receiving as remuneration from $1.25 to $1.50 per day, partly in money and partly in secondhand merchandise. His total cash income from the Goodwill source was $538.49, or an average of $7.61 per week.

Except for the period with the Goodwill Industries in 1934-1935, relator engaged in no industrial activity after August 1931. In September 1935, he was placed on the old-age pension rolls. During his period of unemployment he made repeated applications for employment to the U. S. Employment Office at St. Paul, but without result.

Relator suffered continuously. His first artificial limb, which he had seven years, brought only partial relief. He was able to wear it only part of the time and had to rely upon a cane or crutches for additional support. Notwithstanding that the services of eminent orthopedic surgeons were furnished by the employer, relator's condition failed to improve. Dr. C. C. Chatterton, one

of the attending surgeons, a witness on behalf of the employer, observed drainage from the stump in May, June, and August 1933. He did not attend relator again, however, until 1935, when he dressed the stump. In 1938, Dr. Chatterton observed an abscess in the popliteal space, well above the stump. In 1939, he found an abscess on the anterior surface of the leg. Dr. Chatterton testified, "once he had an infection, definite bodily infection, I think from this stump." He ascribed relator's trouble to the fact that he "had a very heavy muscular calf," ingenuously adding: "it may be my fault because I didn't trim the muscles down enough, but he had the inconvenience or the difficulty of having a pretty thick stump, not a conical shape stump, but it was heavy and it was difficult to get an artificial limb to fit him probably because of the fact the stump was bigger at the bottom than it was at the top, that is, below the knee, * * *; it was just as big even years after the operation as it was in the very beginning, while most individuals, after you amputate the leg the stump gets smaller and smaller at the end. That was not true in this man's case."

In May 1939, Dr. Chatterton personally made a stump model which was used in making a new artificial limb, but the infection persisted. Abscesses recurred and were drained, disclosing thick pus. In May 1941, the stump was reamputated in an attempt to make it smaller. A third artificial limb was fitted, but in January 1942 Dr. Chatterton thought the stump "looked thicker on the end and even in spite of taking out some of the bone and tissue."

In March 1942, surgery was again resorted to. Dr. Chatterton performed the "Gritti-Stokes" operation, described as "cutting off of the femur right above the condyle and putting the kneecap on the bottom of this bone"; to be successful, the kneecap must become fixed. In relator's case, however, the kneecap remained loose, and he was not able to wear a newly designed artificial limb. His pain and suffering continued. Further surgery was indicated, and on September 23, 1942, the patella was removed. Thereafter and until the time of his hearing before the referee on

December 10, 1942, he had constant severe pain in the stump of his leg.

At the hearing before the referee, Dr. Chatterton was of the opinion that, despite the previous failures, a suitable artificial limb could still be designed that would give a measure of usefulness and a certain degree of comfort. Other experts were also of the opinion that the stump could still be fitted with an effective artificial limb, but were emphatic against resort to further surgery. Dr. William H. Von der Weyer, a former associate of Dr. Chatterton, felt that further amputations or experiments with artificial members were not indicated. Dr. Chatterton considered that relator might be industrially useful to some extent in an occupation where he could sit in one place and not be required to walk and where he would be permitted to take his own time and not be rushed. Dr. Von der Weyer, however, testified that, in his judgment, relator was not employable, as did Andrew C. Sorenson, an interviewer for the U. S. Employment Service, who expressed his conviction that a man in relator's condition and dependent upon crutches for support was not placeable in industry. All speculation as to relator's employability or unemployability was removed by his death on August 18, 1943, in the interval between the hearings before the referee and the commission.

Such is the summary of the facts, from which the referee found:

"That as a result of said accident said employe was totally disabled from February 7, 1929 * * * to February 11, 1943, * * * a total of 586 weeks and 1 day. That on September 30, 1935, said disability became permanent total in character and has been continuous thereafter to the date of the last hearing herein, at which time it had not terminated."

The referee concluded:

"That said employe is entitled to * * * compensation on a wage loss basis during the period of 70 weeks he was engaged at the Saint Paul Goodwill Industries, Inc., at the rate of $11.93 per week, or the total sum of $828.10"; that, in addition thereto, he was en-

titled to compensation "at the rate of $17.00 per week during that part of his disability of 586 weeks and 1 day, which together with the payment for temporary partial disability on a wage loss basis as above mentioned shall combined equal the sum of $10,000.00 for permanent total disability," together with "such further medical, surgical, hospital and nursing care and such further artificial appliances as may be needed to cure and relieve the employe's condition."

The commission did not concur in the conclusions of the referee. It substituted instead its own findings: "That as a result of the accidental injury sustained by the employe * * * he sustained the loss of his left leg," and determined that he was only entitled to compensation for the number of weeks prescribed by statute for the loss of his leg. It ordered that the unpaid balance of $425 be paid to Christine Olson, his widow.

Attached to the commission's order is a memorandum which states in part:

"On February 7, 1929, this employe suffered a severe crushing injury to his foot, chiefly to the heel. This resulted in a deformity of the foot. He returned to work for the same employer at a lighter type of work and continued at this work for 17 months, until the old injury to his foot broke down and became infected. This was followed by a long course of treatment and eventuated in an amputation of employe's foot and ankle. He was later fitted with an artificial member, which he wore for several years. During this time, however, he experienced much difficulty with the stump, it would break open and abscesses formed requiring considerable medical treatment and care. Because of this fact a second amputation was done, in an effort to give the employe a more serviceable stump. In an endeavor to attain this hoped for result four operations were performed, the last one being at a point above the knee.

"Throughout this period of time efforts were made by the attend-

ing physician and two makers of artificial members to fit this employe with a serviceable leg, but without success.

\*   \*   \*   \*   \*

"We do not believe \* \* \* that because this employe was unable to obtain a useful artificial leg that his disability therefore exceeded that of the loss of his leg. An effective artificial member permits a reduction in the amount of compensation payable, below the sum fixed for total loss of the member, but inability to obtain a suitable and properly fitted artificial member cannot increase the disability to a leg or an arm beyond the amounts allowed for total loss of such member. Therefore, we hold that this employe's disability was measured by the total loss of a leg and the fact he was not able to be fitted with a suitable artificial leg did not make him a total permanent disability case."

Minn. St. 1941, § 176.11(c)(19), (Mason St. 1941 Supp. § 4274 [c][19]), upon which the commission relies, reads:

"For the loss of a leg so close to the hip that no effective artificial member can be used, 66 2/3 per cent of the daily wage at the time of injury during 200 weeks."

Subsection (e) thereof (§ 4274[e]), upon which relator relies, provides:

"The total and permanent loss of the sight of both eyes, or the loss of both arms at the shoulder, or the loss of both legs so close to the hips that no effective artificial members can be used, or complete and permanent paralysis, or total and permanent loss of mental faculties, *or any other injury which totally incapacitates the employee from working at an occupation which brings him an income, shall constitute total disability."* (Italics supplied.)

Squarely presented is the question as to which subsection controls: Whether compensation must be limited to that fixed specifically for loss of a leg or whether it must be gauged by the extent of disability actually sustained; for the evidence permits no other reasonable conclusion than that relator was in fact totally disabled

for a total of 586 weeks—384 weeks and 5 days of which, beginning on September 30, 1935, and ending on February 11, 1943, the date of the final hearing before the referee, were continuous. Between that hearing and the date of relator's death on August 18, 1943, 27 weeks of total disability were added. Computed on the basis of $17 per week (2/3 of $25.50), the total sum to which relator was entitled, for either temporary total or permanent total dis-ability, far exceeded the statutory maximum of 300 weeks provided by § 176.11(a), (§ 4274[a]), and $10,000 provided by § 176.11(d), (§ 4274[d]), respectively. Are we compelled further to limit relator's recovery by the provisions of subsection (c)(19), fixing recovery for "loss of a leg so close to the hip that no effective artificial member can be used"?

We need not look to the statutes or decisions of other states for the answer. It is contained in the final clause of subsection (e), defining total disability, which we have italicized. That clause was clearly intended as a catch-all provision to allow benefits for total disability where it exists, regardless of the nature or location of the specific injuries bringing about the result. Where, as here, injury to an employe's leg necessitates successive amputations, is complicated by infection permeating his whole system, and results in his total and permanent disability, his right to compensation is measured by such disability, and is not limited to the compensation fixed by statute for the loss of the use of the leg itself.

The enumeration in subsection (e) of several specific injuries which "shall constitute total disability" removed those particular types from debatable ground; it did not exclude other types of injuries from the field of total disability. On the contrary, that field is expressly declared by that subsection to include "any other injury which totally incapacitates the employee," etc. Upon consideration of the context of § 176.11 and of the purposes sought to be effected, it is apparent that the legislature intended this final clause in subsection (e) to govern all cases of total disability not specifically enumerated. The rule of *ejusdem generis,* therefore,

does not apply. 50 Am. Jur., Statutes, § 250; Orme v. Atlas Gas & Oil Co. 217 Minn. 27, 13 N. W. (2d) 757.

In so construing subsection (e), we are not making new law. It has been repeatedly held by this court that it is the actual disability resulting from an industrial accident, and not the nature or location of the specific injuries, that determines the extent of compensation under our compensation act. State ex rel. Kennedy v. District Court, 129 Minn. 91, 151 N. W. 530; State ex rel. Albert Lea Packing Co. Inc. v. District Court, 146 Minn. 283, 178 N. W. 594; Clymer v. The Rubberoid Co. 11 Minn. Workmen's Comp. Dec. (1941) p. 421.

State ex rel. The Broderick Co. v. District Court, 144 Minn. 198, 199, 174 N. W. 826, 827, cannot be distinguished in principle. There, injuries to the employe's hand required amputation of the little finger and also resulted in curvature and shortening of the ring finger, affecting the use of the entire hand. The court said:

"* * * While the compensation act makes express provision for the loss of fingers, from the thumb down, it does not necessarily follow therefrom that an injury of the character here disclosed should be treated as a matter of law as the loss of the little and ring fingers only. If the nature of the injury in such a case, taken as a whole, shows by relation a reduction in the power and usefulness of the hand, as well as the injury to and loss of the fingers, the court may and properly should find the fact accordingly, for the intent and purpose of the compensation act secure to the injured employee compensation for the disability actually sustained."

Since it appears conclusively that relator became totally and permanently disabled at least as early as September 30, 1935, notwithstanding the best surgical care that could be furnished, he is entitled to be compensated on that basis.

Order reversed and case remanded, with an allowance to relator of $100 attorney's fees in this court.

UPON APPLICATION FOR REARGUMENT.

On August 4, 1944, the following opinion was filed:

56

STREISSGUTH, JUSTICE.

Respondent's petition for a rehearing directs our attention to testimony in the record which would have justified the industrial commission in finding as facts that relator was not totally disabled during all of the period recited in our opinion and never became totally and permanently disabled. While the referee found both total and permanent disability, the commission failed to adopt his findings or make findings of its own on the issue, because, under its interpretation of the act, irrespective of the extent of relator's disability, the limit of his recovery was fixed by Minn. St. 1941, § 176.11(c)(19), (Mason St. 1941 Supp. § 4274[c][19]). The case is therefore remanded for appropriate findings as to the extent of the disability actually sustained by relator, and the application of the law as we have construed it to the facts as thus found. Our original opinion is modified to the extent that it declares that temporary total or permanent total disability was conclusively established.

Reversed and remanded.